**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| MING DAI, | No. 15-70776 |
| *Petitioner*, | |
| | Agency No. |
| v. | A205-555-836 |
| WILLIAM P. BARR, Attorney General, | |
| *Respondent.* | ORDER |

Filed October 22, 2019

Before: Sidney R. Thomas, Chief Circuit Judge, and
Stephen S. Trott and Mary H. Murguia, Circuit Judges.

Order;
Statement Respecting Denial by Judge Trott;
Dissent by Judge Callahan;
Statement Respecting Denial by Judges O'Scannlain
and Trott;
Dissent by Judge Collins

# SUMMARY[*]

## Immigration

The panel denied a petition for rehearing en banc on behalf of the court.

Dissenting from the denial of rehearing en banc, Judge Callahan, joined by Judges Bybee, Bea, M. Smith, Ikuta, Bennett, R. Nelson, Bade, Collins, and Lee, wrote that in denying en banc review, the court has condoned a decision by a three-judge panel that takes the extraordinary position of holding that, absent an explicit adverse credibility ruling, an immigration judge must take as true an asylum applicant's testimony that supports a claim for asylum, even in the face of other testimony from the applicant that would undermine an asylum claim, thereby restoring this circuit's prior errant "deemed true" rule that Congress abrogated when it enacted the REAL ID Act. Judge Callahan explained that the panel's decision ties the hands of IJs who are presented with conflicting evidence, effectively forcing them to accept an applicant's favorable testimony as the whole truth and to disregard unfavorable evidence—even when it is the applicant's own testimony—unless they affirmatively make an adverse credibility finding, thus transforming the lack of an express adverse credibility ruling into an affirmative conclusion that the applicant's proffered reason for seeking asylum is true. Judge Callahan wrote that the panel's decision is contrary to the statute, this court's precedent, and the rulings of sister circuits, and that in addition to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

overstepping the court's limited role in reviewing the agency's decision, is also bad policy. Judge Callahan also wrote that by directing the agency to grant withholding relief and treat petitioner as eligible to asylum, the panel compounded its error by failing to follow the ordinary remand rule, and allowing the agency the first shot at applying the majority's new rule.

Dissenting from the denial of rehearing en banc, Judge Collins, joined by Judges Bybee, Bea, Ikuta, Bennett, R. Nelson, and Bade, agreed with Judge Callahan that the panel majority's opinion effectively revives this court's discredited prior "deemed-true" rule in contravention of controlling statutory language, precedent of this court and other circuits, and common sense. In Judge Collins's view, the problems with the panel majority's opinion run even deeper by committing a further serious legal error, and reinforcing a circuit split, in holding that the REAL ID Act did not abrogate a second "deemed-credible" rule, whereby this court conclusively presumes an applicant's testimony to be credible unless the agency has made an explicit adverse credibility finding. Judge Collins wrote that the REAL ID Act expressly abrogated the deemed-credible rule entirely and replaced it with, at most, a rebuttable presumption of credibility. Judge Collins reasoned that the Board's express statement that petitioner was not "truthful" was a permissible application of the REAL ID Act's rebuttable presumption of credibility, and sufficiently explicit to preclude this court's application of the deemed-credible rule in this case.

Respecting the denial of rehearing en banc, Judge Trott, joined by Judge R. Nelson, wrote that instead of following the REAL ID Act, this court has perpetuated a contrived rule that in the absence of an adverse credibility finding, a petitioner

must be deemed credible, and then used that conclusion to override an IJ's and the Board's well-supported determination that the petitioner's case was not sufficiently "persuasive" to meet his burden of proof. Judge Trott wrote that, in doing so, the panel has rewritten the REAL ID Act, ignored Congress, and created an inter-circuit split.

Respecting the denial of rehearing en banc, Judges O'Scannlain and Trott agreed with the views expressed by Judge Callahan in her dissent from the denial of rehearing en banc.

## COUNSEL

David Z. Su, Law Offices of David Z. Su, West Covina, California; David J. Zimmer, Goodwin Procter LLP, Boston, Massachusetts; William M. Jay, Goodwin Procter LLP, Washington, D.C.; for Petitioner.

Aimee J. Carmichael, Senior Litigation Counsel; Mary Jane Candaux and John W. Blakeley, Assistant Directors; Donald Keener, Deputy Director; Office of Immigration, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## ORDER

The full court has been advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed R. App. P. 35. Judge Miller was recused and did not participate in the vote.

The petition for rehearing en banc is denied. Attached are dissents from and statements respecting the denial of rehearing en banc.

---

TROTT, Circuit Judge,[**] with whom R. NELSON, Circuit Judge, joins, respecting the denial of rehearing en banc:

Instead of following the REAL ID Act ("Act"), our court has perpetuated a contrived rule that in the absence of an adverse credibility finding, a petitioner must be deemed credible. We then use that conclusion to override an Immigration Judge's ("IJ") and the Board of Immigration Appeals' ("Board") well-supported determination that this petitioner's case was not "persuasive." In so doing, we have rewritten the Act. We have a long history of ignoring Congress and the Supreme Court, and here we have done it

---

[**] As a judge of this court in senior status, I no longer have the power to vote on calls for rehearing cases en banc or formally to join a dissent from failure to rehear en banc. *See* 28 U.S.C. § 46(c); Fed. R. App. P. 35(a). Following our court's general orders, however, I may participate in discussions of en banc proceedings. *See* Ninth Circuit General Order 5.5(a).

again. *See Dai v. Sessions*, 916 F.3d 731, 875–93 (9th Cir. 2019) (Trott, J., dissenting).  Moreover, the panel majority opinion creates an intercircuit conflict.  I will address that problem later in Part IV.

## I

As explained in his thorough and convincing decision, Immigration Judge Stephen Griswold, determined that Dai had not met his statutory burden of persuasion on the central issue of whether he was eligible as a refugee for asylum.  The documented fatal flaws in Dai's case were (1) his glaring attempt to deceive the asylum officer by concealing highly probative damaging facts that go to the very core of his case, facts that Dai also omitted from his Form I-589 application for asylum, (2) his admission when pressed that his deceit was intentional, driven by his understanding that the concealed evidence would damage his probability of success, (3) his inadequate explanations for the contradictions in his presentation, (4) his telling demeanor on cross examination, and (5) the "real story" behind his departure from China and his decision not to return with his wife and daughter.  The IJ regarded these flaws as demonstrating a "lack of forthrightness."  Accordingly, the IJ concluded pursuant to the language of the Act that Dai's case was not "persuasive."

Reviewing de novo whether Dai had adequately met his burden of persuasion that he was eligible for asylum, the Board of Immigration Appeals agreed that he had not.  To support its conclusion, the Board referenced the same material flaws the IJ found as facts.  Their reasoned decision should end this case, but with all respect, the panel majority and now our court have converted this straightforward matter into a textbook example of elevating form over substance,

taking a blue pencil to the Act's requirement that an applicant's case must be "persuasive" and inappropriately substituting our judgment for the Board's.

## II

Here is Judge Griswold's compelling decision. Reading it illustrates how wrong our court's analysis is.

> I have carefully considered the respondent's testimony and evidence and for the following reasons, I find that the respondent has failed to meet his burden of proving eligibility for asylum.
>
> The principal area of *concern with regard to the respondent's testimony* arose during the course of his cross-examination. On cross-examination, the respondent was asked about various aspects of his interview with an Asylum Officer. The Department of Homeland Security also submitted the notes of that interview as Exhibit 5. The respondent was asked specific questions regarding several aspects of his testimony before the Asylum Officer. In the course of cross-examination, the respondent was asked regarding his questions and answers as to whether his wife and daughter travelled with him to the United States. The respondent's responses included the question of whether the asylum officer had asked him if his wife and daughter travelled anywhere other than to Taiwan and Hong Kong. The respondent conceded that he was

asked this question and that he replied yes,
they had travelled to Taiwan and Hong Kong.
The respondent was asked whether the
Asylum Officer inquired whether his wife and
daughter had travelled elsewhere. The
respondent then testified before the Court that
he was asked this question, "but I was
nervous." In this regard, I note that the
respondent did not directly answer the
question; instead leapt directly to an
explanation for what his answer may have
been, namely that he was nervous. The
respondent was then asked specifically
whether the Asylum Officer asked him if his
wife had travelled to Australia in 2007. The
respondent confirmed that he had been asked
this question, and he confirmed that the
answer was in the affirmative. The
respondent also confirmed that the Asylum
Officer had asked him whether she had
travelled anywhere else. He confirmed that he
had been so asked. The respondent was then
asked whether he answered "no," that she had
not travelled anywhere else. The respondent
answered that he believed so, that he had so
answered. The respondent was then asked,
during the course of cross-examination, why
he had not said to the Asylum Officer that yes,
she had travelled to the United States. The
respondent replied that he had not thought of
it. He stated that they did come with him
(meaning his wife and daughter) and that he
thought the Asylum Officer was asking him if
they had travelled anywhere other than the

United States. He explained that he did so because he assumed the U.S. Government had the records of their travel to the United States. On further questioning, the respondent eventually hesitated at some length when asked to further explain why he did not disclose spontaneously to the Asylum Officer that his wife and daughter had come with him. The respondent paused at some length and I observed that the respondent appeared nervous and at a loss for words. However, after a fairly lengthy pause, the respondent testified that he is afraid to say that his wife and daughter came here and why they went back. The respondent was asked whether he told the Asylum Officer that he was afraid to answer directly. The respondent initially testified that he forgot and did not remember whether he said that. He again reiterated that he was very nervous. He was then asked the question again as to whether he told the Asylum Officer that he was afraid to answer why his wife and daughter had gone back. He then conceded that maybe, yes, he had answered in that fashion. The respondent was asked whether the Asylum Officer inquired why his wife and daughter went back, and the respondent conceded that he had been so asked, and he further conceded that he replied because school in the United States costs a lot of money (referring to the schooling for his daughter). *The respondent was then asked to confirm that the Asylum Officer eventually asked him to tell him the real story as to why*

*his family travelled to the United States and returned to China.* The respondent confirmed that he was asked this question and when asked, whether he replied that it was because he wanted a good environment for his child and because his wife had a job and he did not and that that is why he stayed here. He confirmed that he did, in fact, say that. The respondent was further asked, during the course of testimony in court, why his wife and daughter returned to China. In this regard, the respondent testified that they came with him, but returned to China several weeks after arrival. He testified that they did so because his father-in-law was elderly and needed attention, and because his daughter needed to graduate school in China.

The respondent further claimed that his wife had, in fact, suffered past persecution in the form of a forced abortion and the respondent confirmed that he feared his wife and daughter would suffer future persecution. In this regard, the respondent qualified his answer by saying that his wife was now on an IUD, apparently thereby suggesting that the risk of persecution is reduced. However, the respondent did concede that the risk of future persecution also pertains to his daughter. Indeed, in this regard, the respondent testified that this is, at least in part, why he applied for asylum.

*As to the contents of Exhibit 5, I give the notes full weight, insofar as the respondent has confirmed the contents of the questions and answers given during the course of that interview. Furthermore, I note that in the sections in which the respondent equivocated, stating that he was nervous and not sure that he gave those precise answers, I nevertheless give the Asylum Officer's notes some substantial weight, in that they are consistent with the respondent's testimony in court.* Specifically, I note that the Asylum Officer's notes state that the respondent ultimately indicated that he was afraid of giving straight answers regarding his daughter and wife's trip to the United States and return to China. And while the respondent did not confirm this in court, he did give a similar answer as to why he was testifying in this regard. In other words, the respondent appears to have stated, both before the Asylum Officer and in court that he did not spontaneously disclose the travel of his wife and daughter with him to the United States and their return because *he was nervous about how this would be perceived by the Asylum Officer in connection with his claim*. I further note that the Asylum Officer's notes are internally consistent with regard to references to earlier questions, such as whether the respondent had stated that he applied for a visa with anyone else. *At page 2 of the notes contained in Exhibit 5, the respondent was asked whether he applied for his visa with anyone else and the notes*

*indicated that he stated that, "no, I applied by myself." Similarly, I note that the testimony before the Asylum Officer and the Court is consistent with the omission in the respondent's Form I-589 application for asylum, of an answer to the question of the date of the previous arrival of his wife, if she had previously been in the United States*. *See* Exhibit 2, page 2, part A.II, question 23. When asked about this omission, the respondent expressed surprise, stating that he told the preparer about their trip and indicated that he thought it had been filled out. Notwithstanding the respondent's statement in this regard, *I do observe that the omission is consistent with his lack of forthrightness before the asylum office as to his wife and daughter's travel with him to the United States and their subsequent return to China shortly thereafter*.

In sum, the respondent's testimony before the Court and his testimony regarding the Asylum Officer notes, as well as the notes themselves, clearly indicate that the respondent failed to spontaneously disclose that his wife and daughter came with him and then returned to China. His testimony and the notes also consistently demonstrate that the respondent paused at length, both before the Court and before the Asylum Officer, when asked about this topic. His testimony and the Asylum Officer notes are also consistent in indicating that he ultimately testified that he was afraid

to say that his wife came here and was afraid of being asked about why she went back. *Furthermore, the respondent has conceded that he was asked to "tell the real story" about his family's travel to the United States by the Asylum Officer, and that he replied that he wanted a good environment for his child and his wife had a job, but he did not, and that is why he stayed here*.

In *Loho v. Mukasey*, 531 F.3d 1016, 1018–19 (9th Cir. 2008), the Ninth Circuit addressed the situation in which an asylum applicant has found safety in the United States and then returns to the country claimed of persecution before eventually finding asylum in the United States. The Ninth Circuit held that the applicant's voluntary return to the country of claimed persecution may be considered in assessing both credibility and whether the respondent has a well-founded fear of persecution in that country. Here, while the respondent himself has not returned to China, his wife and daughter did. Indeed they did so shortly after arriving in the United States, and the respondent confirmed that they did so because the schooling is cheaper for his daughter in China, as well as because his father-in-law is elderly and needed to be cared for. The respondent also told the Asylum Officer that the "real story" about whey [sic] his family returned was that his wife had a job and he did not, and that is why he stayed here. This is consistent with respondent's testimony

before the Court that he did not have a job at the time he came to the United States. Furthermore, I note that the respondent's claim of persecution is founded on the alleged forced abortion inflicted upon his wife. That is the central element of his claim. The respondent claims that he himself was persecuted through his resistance to that abortion. Nevertheless, the fact remains that the fundamental thrust of the respondent's claim is that his wife was forced to have an abortion. In this regard, the respondent's wife therefore clearly has an equal, or stronger, claim to asylum than the respondent himself, assuming the facts which he claims are true. The respondent was asked why his wife did not stay and apply for asylum and he replied that he did not know they could apply for asylum at the time they departed. *The respondent was then asked why he stayed here after they returned; he said because he was in a bad mood and he wanted to get a job and a friend of mine is here*.

While *Loho v. Mukasey* applies to the applicant himself returning to China, I find that the reasoning of the Ninth Circuit in that case is fully applicable to the respondent's situation in that his wife, who is the primary object of the persecution in China, freely chose to return to China. *I do not find that the respondent's explanations for her return to China while he remained here are adequate*. The respondent has stated that he was in a bad

mood and that he had found a job and had a
friend here.  The respondent has also indicated
that his daughter's education would be
cheaper in China than here, and he has also
indicated that his wife wanted to go to take
care of her father.  I do not find that these
reasons are sufficiently substantial so as to
outweigh the concerns raised by his wife and
daughter's free choice to return to China after
having allegedly fled that country following
his wife's and his own persecution.

In view of the for[e]going, I find that the
respondent has failed to meet his burden of
proving eligibility for asylum under Section
208(a) of the Act.

(Emphasis added).

### III

Assuming for the sake of argument only that the
Immigration Judge's findings of Dai's (1) "lack of
forthrightness," (2) guilty demeanor, (3) inadequate
explanations for his admittedly contradictory answers, and
(4) willful concealment of relevant information did not
amount to an "explicit" adverse credibility determination,
then Dai is statutorily entitled to a "rebuttable presumption of
credibility on appeal" – to the Board.  On appeal to the Board,
however, they dismissed this presumption, as was their
statutory prerogative, concluding in the words of the Act that
Dai's case was not persuasive:

We review for clear error the findings of fact, including determinations of credibility, made by the Immigration Judge. We review de novo all other issues, including whether the parties have met the relevant burden of proof, and issues of discretion. The respondent filed his application for asylum after May 11, 2005, and thus review is governed by the REAL ID Act of 2005.

We adopt and affirm the Immigration Judge's decision in this case. The Immigration Judge correctly denied the respondent's applications for failure to meet his burden of proof. The record reflects that the respondent failed to disclose to both the [DHS] asylum officer and the Immigration Judge that his wife and daughter had traveled with him to the United States and voluntarily returned to China shortly after. *The respondent further conceded that he was not forthcoming about this information because he believed that the true reasons for their return – that his wife had a job in China and needed to care for her elderly father, and that their daughter could attend school in China for less money than in the United States – would be perceived as inconsistent with his claims of past and feared future persecution.*

The Immigration Judge correctly decided that the voluntary return of the respondent's wife and daughter to China, after allegedly fleeing following the persecution of the respondent

and his wife, prevents the respondent from meeting his burden of proving his asylum claim. *Contrary to the respondent's argument on appeal, the Immigration Judge need not have made an explicit adverse credibility finding to nevertheless determine that the respondent did not meet his burden of proving his asylum claim.* The respondent's family voluntarily returning *and his not being truthful about it is detrimental to his claim and is significant to his burden of proof.*

(Emphasis added) (footnote and citations omitted).

## IV

In *Kho v. Keisler*, 505 F.3d 50 (1st Cir. 2007), the First Circuit understood the Act's effect on the issue of an applicant's credibility. Not only did our sister circuit correctly comprehend the Act's impact, but it considered and rejected our approach to this important subject.

Kho supplements his 'disfavored group' approach with an argument that because the IJ did not make an explicit finding concerning Kho's credibility, his testimony 'must be accepted as true' by this court. Kho bases this proposed rule as well on a series of Ninth Circuit cases. . . .

We have already rejected the proposition that aliens are entitled to a presumption of credibility on review in this court if there is no

express credibility determination made by an
IJ. . . .

The REAL ID Act also provides no support
for Kho's argument. . . .

*Kho*, 505 F.3d at 56–57.

The court further explained that the Act's reference to a
"rebuttable presumption" applies only to an applicant's
appeal to the BIA, not to "reviewing courts of appeal." *Id.*
at 56.

Accordingly, not only does our court's decision violate
the directions of the Act, but it creates an intercircuit conflict
with *Kho*.

## V

Whether or not this petitioner attains asylum in our
country is of minor concern, but the significant damage our
court has done to the Act and to Congress' attempt to stop us
from substituting our judgment for the Board's are matters
that must be corrected.  Thus, I disagree with our decision not
to rehear en banc this case.

CALLAHAN, Circuit Judge, with whom BYBEE, BEA, M. SMITH, IKUTA, BENNETT, R. NELSON, BADE, COLLINS, LEE, Circuit Judges, join, dissenting from denial of rehearing en banc:

Under the REAL ID Act of 2005, an immigration judge (IJ) has the task of evaluating an asylum application. Here, in denying en banc review, we have condoned a decision by a three-judge panel that takes the extraordinary position of holding that, absent an explicit adverse credibility ruling, an IJ must take as true an asylum applicant's testimony that supports a claim for asylum, even in the face of other testimony from the applicant that would undermine an asylum claim. This makes no sense and ignores the realities of factfinding. Our decision restores our prior errant rule that Congress abrogated. As we have declined to correct this erroneous decision ourselves, hopefully the Supreme Court will do so.

Before Congress enacted the REAL ID Act, our court had fashioned unique rules devised to restrict the agency's discretion in adjudicating asylum claims. The REAL ID Act broadened the agency's discretion. In explaining the amendments, Congress singled out our court for adopting rules that strayed from all other circuits and the Board of Immigration Appeals. In this case, the divided panel ignored this history and revived a rule that we previously said was "swept away" by the REAL ID Act. *Aden v. Holder*, 589 F.3d 1040, 1045 (9th Cir. 2009).

The immigration judge here was presented with conflicting statements from the asylum applicant, Ming Dai, about why he came to and sought to remain in the United States. The IJ did not make an express adverse credibility

finding but instead found Dai's testimony was not sufficiently persuasive to meet his burden of proof. The panel majority erroneously concluded that, absent an explicit, cogently-explained adverse credibility finding, an IJ is required to accept the favorable portions of an asylum applicant's testimony as the unassailable truth.

According to the panel, in weighing the persuasiveness of the asylum applicant's testimony, an IJ must ignore any unfavorable testimony because such testimony—which could impugn the applicant's credibility—"cannot be smuggled into the persuasiveness inquiry." *Dai v. Sessions*, 884 F.3d 858, 872 (9th Cir. 2018). The panel's holding allowed it to "expunge from the record the blatant flaws in Dai's performance involving demeanor, candor, and responsiveness," *Dai v. Barr*, 916 F.3d 731, 747 (9th Cir. 2018) (Trott, J., dissenting), thus tying the IJ's hands in carrying out the statutory role as trier of fact.

The panel's holding is contrary to the statute, our own precedent, and the rulings of our sister circuits. In addition to overstepping our limited role in reviewing the agency's decision, the holding is also bad policy. Just because testimony is credible (i.e., believable), it doesn't mean it must be wholly accepted as the truth. A factfinder may resolve factual issues against a party without expressly finding that party not credible. This is a regular, non-controversial occurrence in everyday litigation.

On close examination, the panel's artful evasion of the REAL ID Act is nothing short of an outright arrogation of the agency's statutory duty as trier of fact. After adopting its ill-advised rule, the panel took up the mantle of factfinder and pronounced that Dai's testimony is persuasive. In doing so,

the panel "intrude[d] upon the [factfinding] domain which Congress has exclusively entrusted to an administrative agency." *INS v. Ventura*, 537 U.S. 12, 16 (2002) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)). We are asking yet again to be summarily reversed for violating the "ordinary remand rule." *See Gonzales v. Thomas*, 547 U.S. 183, 187 (2006); *Ventura*, 537 U.S. at 18.

## I.

### A.

Petitioner Ming Dai, a citizen of China, challenged the IJ's finding—adopted and affirmed by the BIA—that Dai's testimony was not persuasive in showing that he is a refugee. Dai's claim for asylum is premised on events occurring in China in July 2009, when family planning officials came to take his pregnant wife for an abortion. Dai claimed he fought with officers, after which he was detained for ten days and eventually fired from his job. While Dai was detained, his wife was allegedly subjected to a forced abortion.

Dai stated in the affidavit accompanying his application that he sought asylum because he wished to "bring [his] wife and daughter to safety." In fact, Dai's wife and daughter had entered the United States with him but had voluntarily returned to China shortly thereafter. Dai neglected to disclose this information in his application, affidavit, interview with the asylum officer, or on direct examination before the IJ.

The IJ found Dai's claim for asylum unpersuasive. In the IJ's view, "[t]he principal area of concern" was Dai's testimony during cross-examination. The IJ noted Dai's evasive answers to questions about his interview with the

asylum officer.  During cross-examination, Dai was asked why he had not revealed that his wife and daughter had come with him to the United States and why they returned to China shortly thereafter.  "[A]fter a fairly lengthy pause," and appearing to the IJ to be "nervous and at a loss for words," Dai stated that he was afraid to speak about his wife and daughter.  When asked by the asylum officer what he was afraid of, Dai said he was afraid the officer would ask why his wife and daughter willingly went back to China.  Dai was apparently concerned that revealing the facts about his wife and daughter would undercut his claim that he wished to bring them to safety.  Dai eventually admitted that the "real story" for why he stayed in the United States when his family returned to China was because "he was in a bad mood and he wanted to get a job and a friend of mine is here."  In essence, the IJ credited Dai's "real story" that he came to the United States to seek employment, rather than his story that he came to flee persecution.

The BIA adopted and affirmed the IJ's decision, concluding that the voluntary return of Dai's family to China and his failure to be forthcoming with that information was "detrimental to his claim" and "significant to his burden of proof."

## B.

Dai sought review in our court.  In his brief, Dai presumed the agency made an adverse credibility finding, and he argued only that the IJ's determination that he failed to meet his burden of proof was not supported by substantial evidence.  The government, in response, argued Dai failed to show that the record compels a conclusion that he met his burden of proof.

A split panel granted Dai's petition.  The majority stated that, under the REAL ID Act, an applicant's testimony alone "is sufficient"[1] to establish eligibility for asylum provided the "testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." *Dai*, 884 F.3d at 867 (citing 8 U.S.C. § 1158(b)(1)(B)(ii)). Departing from the issue as framed by the parties,[2] the majority held that, because neither the IJ nor BIA made an explicit adverse credibility ruling, Dai must be "deemed credible." *Dai*, 884 F.3d at 868.  The majority concluded that nothing in the REAL ID Act abrogated our pre-REAL ID Act rule that an applicant must be deemed credible in the absence of an explicit adverse credibility determination.  *Id.* at 868–69.

The panel majority then expanded the impact of that holding by adopting a novel rule constraining an IJ's ability to weigh the evidence when no express adverse credibility ruling has been made.  The majority held that, in weighing the *persuasiveness* of an applicant's claim, an IJ is precluded from considering evidence—even the applicant's own admissions—that might impugn the applicant's credibility. *Id.* at 872 ("Credibility concerns that do not justify an adverse credibility finding cannot be smuggled into the

---

[1] The statute actually says "may be sufficient," not "is sufficient." *See* 8 U.S.C. § 1158(b)(1)(B)(ii).

[2] As noted in Judge Trott's dissent, because the government "responded only to the claims and arguments Dai included in his brief," it did not have "an opportunity to respond to the majority's inventive analysis, nor to the theory concocted by the majority on Dai's behalf." *Dai*, 916 F.3d at 733 (Trott, J., dissenting).  Judge Trott predicted that "[b]oth sides will be surprised by my colleagues' artful opinion—Dai pleasantly, the Attorney General not so much."  *Id.*

persuasiveness inquiry . . . .").  That remarkable holding bears
repeating: An applicant's admissions (or other evidence) that
undermine the persuasiveness of an asylum claim must be
disregarded if that evidence also bears on the applicant's
credibility.

This invented rule enabled the majority to reject the
agency's reasons for finding Dai's claim not persuasive.  *Id.*
at 870–73.  Having wiped from the record Dai's unfavorable
testimony, the majority assumed the role of trier of fact and
pronounced that "nothing [in the (now-cleansed) record]
undermines the persuasiveness of Dai's credible testimony."
*Id.* at 871.  The majority thus held that Dai was eligible for
asylum and entitled to withholding of removal.  *Id.* at 874.
The majority remanded with instructions to grant withholding
of removal and to decide whether Dai should also be granted
asylum as a matter of discretion.  *Id.*

In dissent, Judge Trott wrote that "[t]he practical effect of
the majority's rule is breathtaking: The *lack* of a formal
adverse credibility finding becomes a selective positive
credibility finding and dooms a fact-based determination by
an IJ and the BIA that an applicant's case is not sufficiently
persuasive to carry his burden of proof."  *Dai*, 916 F.3d
at 735 (Trott, J., dissenting).  Judge Trott argued that "[t]he
IJ's decision not to make an explicit adverse credibility
finding is a red herring that throws our analysis off the scent
and preordains a result that is incompatible with the
evidentiary record."  *Id.* at 731.  Judge Trott asserted that the
majority ignored "the IJ's fact-based explanation for his
decision" and several material findings of fact, "each of
which is entitled to substantial deference."  *Id.*

## II.

## A.

Before the enactment of the REAL ID Act, our court created what we characterized as a "deemed true" rule. *Ladha v. INS*, 215 F.3d 889, 900 (9th Cir. 2000). Under that rule, when "an alien credibly testifies to certain facts, those facts are deemed true." *Id.* The "deemed true" rule developed as an extension of two other rules—the rule that an applicant would be deemed credible in the absence of an adverse credibility ruling and the rule prohibiting factfinders from requiring corroborative evidence from credible applicants.[3] *Id.* at 899–900; *see id.* at 899 ("'[T]his court does not require corroborative evidence,' *Cordon-Garcia v. INS*, 204 F.3d 985, 992 (9th Cir. 2000), from applicants for asylum and withholding of deportation who have testified credibly.").

The "deemed true" rule and the rule against requiring corroborative evidence did not escape criticism. In prior opinions, members of our court observed that some of our rules concerning credibility and standard of proof were out of

---

[3] In some of our cases, we have not been careful in our phrasing, using the expressions "deemed credible" and "deemed true" interchangeably. For example, the primary case that the panel majority cited in support of the proposition that the "deemed credible" rule survives the REAL ID Act states that the testimony must be treated as though it is "true." *Hu v. Holder*, 652 F.3d 1011, 1013 n.1 (9th Cir. 2011). Before the REAL ID Act and its introduction of a requirement for corroborative evidence and the weighing of credible evidence, this imprecision of language arguably made no practical difference. The new provisions of 8 U.S.C. § 1158(b)(1)(B) now require adjudicators to distinguish between credibility and truth.

line with the approach followed by other circuits and contrary to the limited standard of review mandated by Congress. *See, e.g.*, *Quan v. Gonzales*, 428 F.3d 883, 892 (9th Cir. 2005) (O'Scannlain, J., dissenting) ("I do not believe that an IJ's decision should be overturned merely because the reviewing panel disagrees with it or can point to a plausibly analogous case from our abundant and inconsistent precedent."); *Jibril v. Gonzales*, 423 F.3d 1129, 1138 (9th Cir. 2005) ("Time and again, however, we have promulgated rules that tend to obscure th[e] clear standard [of review] and to flummox immigration judges, who must contort what should be a simple factual finding to satisfy our often irreconcilable precedents."); *Abovian v. INS*, 257 F.3d 971, 980 (9th Cir. 2001) (Kozinski, J., dissenting from denial of rehearing en banc) ("[T]his case is hardly atypical of our circuit's immigration law jurisprudence. Rather, it is one more example of the nitpicking we engage in as part of a systematic effort to dismantle the reasons immigration judges give for their decisions.").

To correct our misguided rules, Congress passed the REAL ID Act. Congress made clear its intent to bring us—the Ninth Circuit—in line with other circuits and the BIA. *See* H.R. Rep. No. 109-72, at 167 (2005) (Conf. Rep.), *as reprinted in* 2005 U.S.C.C.A.N. 240 ("[T]he creation of a uniform standard for credibility is needed to address a conflict on this issue between the Ninth Circuit on the one hand and other circuits and the BIA."). The REAL ID Act states that the applicant "may" sustain his burden through testimony alone, "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). That provision also states that "the trier

of fact may weigh the credible testimony along with other evidence of record." *Id.* The REAL ID Act creates a "bias toward corroboration" that makes asylum litigation more like other types of litigation in that the trier of fact need not accept testimony as true even if it's credible. *Aden*, 589 F.3d at 1045. Lest there was any doubt that the REAL ID Act abrogated our "presumed true" rule, we expressly stated so in *Aden*: "Congress has thus swept away our doctrine that 'when an alien credibly testifies to certain facts, those facts are deemed true.'" *Id.* (quoting *Ladha*, 215 F.3d at 900).

Ignoring what we said in *Aden*, the panel majority crafted a new rule that, in conjunction with the deemed credible rule, operates to revive the congressionally disapproved "deemed true" rule. This revival occurred in two steps. The panel first held that nothing in the REAL ID Act "explicitly or implicitly repealed the rule that in the absence of an adverse credibility finding by the IJ or the BIA, the petitioner is deemed credible." *Dai*, 884 F.3d at 868.[4]

---

[4] Again, precision of language is important here. Even assuming that when the agency makes no credibility finding, the petitioner's testimony is deemed *credible*, that is not enough. Credibility alone doesn't make a person persuasive or eligible for asylum, nor must credible testimony be accepted as true. *Aden*, 589 F.3d at 1044 ("Credible testimony is not by itself enough."); *see also Sandie v. Att'y Gen. of U.S.*, 562 F.3d 246, 252 (3d Cir. 2009) ("But the assumption that his testimony is credible does not imply that that testimony is sufficient to meet his burden of proof. In fact, credible testimony alone is not always sufficient to meet the burden of proof."). An applicant's testimony may be sufficient to show asylum eligibility, "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, *is persuasive*, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii) (emphasis added).

The panel's second, decisive step in reviving our old "deemed true" rule was to limit the evidence an IJ can consider in weighing the persuasiveness of an applicant's testimony. The panel held that if the agency makes no adverse credibility finding, "[c]redibility concerns . . . cannot be smuggled into the persuasiveness inquiry." *Id.* at 872. The panel reasoned that if the agency makes no adverse credibility finding, any evidence that would cast doubt on the applicant's credibility must be ignored when considering the *persuasiveness* of the applicant's claim. The panel deployed its holding to erase from the record Dai's own admissions that undermine his claim. For example, the IJ accepted as fact Dai's admission that he failed to disclose the truth about his wife's and his daughter's travels because he was nervous about how this would be perceived by the asylum officer. The IJ also credited Dai's admitted "real story" for why he stayed in the United States when his wife and daughter returned home: "he was in a bad mood and he wanted to get a job and a friend of mine is here." The panel's decision bars the IJ from considering this and other testimony that could be (and was) construed as detrimental to Dai's case.**⁵**

The panel's decision ties the hands of IJs who are presented with conflicting evidence, effectively forcing them to accept an applicant's favorable testimony as the whole truth and to disregard unfavorable evidence—even when it is

---

**⁵** In his dissent, Judge Trott identified other examples of Dai's testimony that the IJ relied on in finding his claim unpersuasive. *See Dai*, 916 F.3d at 732 (Trott, J., dissenting) (listing eight findings rendered by the IJ); *id.* at 747–48 ("My colleagues expunge from the record the blatant flaws in Dai's performance involving demeanor, candor, and responsiveness . . . . They disregard inaccuracies, inconsistencies, and implausibilities in his story, and his barefaced attempt to cover up the truth about his wife's and daughter's travels and situation.").

the applicant's own testimony—unless they affirmatively make an adverse credibility finding. The panel's two-fold holding thus transforms the lack of an express adverse credibility ruling into an affirmative conclusion that the applicant's proffered reason for seeking asylum is *true*.

The resuscitation of our old "deemed true" rule flouts Congress's purpose in enacting the REAL ID Act.[6] First, the panel's holding violates the statute's directive that the agency is to conduct the factfinding and that our court may disturb the agency's decision only where "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). "[T]he law is that '[t]o reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it.'" *Aden*, 589 F.3d at 1046 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)). The majority's holding cannot be squared with the limited nature of our review of the agency's decision.

Second, the majority's revival of the "deemed true" rule nullifies the statutory provision that, "[i]n determining

---

[6] The majority turns somersaults to dodge Congress's explicit attempt to rein us in. The statute provides: "There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal." 8 U.S.C. § 1158(b)(1)(B)(iii). The majority, ignoring the phrase "[t]here is no presumption of credibility," apparently presumed it to apply only in immigration court proceedings. The majority reasoned that the "rebuttable presumption of credibility on appeal" does not apply in our court because this case is a *petition for review* not an *appeal*. *Dai*, 884 F.3d at 869 ("A provision that applies 'on appeal' therefore does not apply to our review, but solely to the BIA's review on appeal from the IJ's decision."). According to the majority's logic, this gives us carte blanche to adopt whatever rule we want on the evidence an IJ must (and must not) credit.

whether the applicant has met the applicant's burden, the trier
of fact may weigh the credible testimony along with other
evidence of record." 8 U.S.C. § 1158(b)(1)(B)(ii). We have
held that this provision means that an "IJ need not accept
[credible] testimony as true." *Aden*, 589 F.3d 1044. If
credible testimony must be accepted as true, there would be
nothing for the trier of fact to "weigh." *See Doe v. Holder*,
651 F.3d 824, 830 (8th Cir. 2011) ("Congress thus rejected a
rule that 'credible' testimony necessarily means that the facts
asserted in that testimony must be accepted as true." (citing
*Aden*, 589 F.3d at 1045)).[7]

## B.

In addition to contravening the language and intent of the
REAL ID Act, the panel's decision squarely conflicts with
our own precedent and every other circuit to address the
issue.

The panel's decision is contrary to *Aden*'s clear
acknowledgement that the REAL ID Act abrogated our
"deemed true" rule. The decision is also at odds with *Singh
v. Holder*, 753 F.3d 826 (9th Cir. 2014). In *Singh*, we held
that the agency did not err in discounting the petitioner's
credible evidence that the police were looking for him, when
weighed against country reports that stated that the police no

---

[7] To be clear, the panel majority held that absent an adverse
credibility ruling, the trier of fact must disregard any evidence that would
call into question the applicant's credibility. *See Dai*, 884 F.3d at 872
("Credibility concerns that do not justify an adverse credibility finding
cannot be smuggled into the persuasiveness inquiry so as to undermine the
finding of credibility we are required to afford Dai's testimony."). There
is no meaningful difference between this holding and a suggestion that
credible testimony must be accepted as true.

longer targeted Sikh activists like the petitioner. *Singh*, 753 F.3d at 836. We recognized that "there is a difference between an adverse credibility determination, on the one hand, and a decision concerning how to weigh conflicting evidence, on the other hand." *Id.* We emphasized that, even in the absence of a credibility ruling, the immigration judge was required to weigh the persuasiveness of the testimony against the record as a whole. *Id.*

In *Doe*, the Eighth Circuit held that an applicant's inability to provide important details and key dates—information the immigration judge identified as "damaging to [Doe's] credibility," but without making an "explicit" adverse credibility finding—was sufficient to support the BIA's conclusion that his testimony was unpersuasive. *Doe*, 651 F.3d at 829–30 (alteration in original). The court relied in part on our decision in *Aden* for the proposition that testimony may be "credible" without being persuasive, and thus need not be "accepted as true." *Id.* at 830.

Similarly, the First Circuit has rejected the notion that a reviewing court is bound "to accept a petitioner's statements as fact whenever an IJ simply has not made an express adverse credibility determination." *Kho v. Keisler*, 505 F.3d 50, 56 (1st Cir. 2007). The Tenth Circuit likewise held that the agency was free to "discount" the applicant's testimony based on "gaps" in his story, even though there was no adverse credibility ruling. *Gutierrez-Orozco v. Lynch*, 810 F.3d 1243, 1246 (10th Cir. 2016) (citing *Aden*, 589 F.3d at 1044–45).

The panel's holding splits with *Aden* and places us again at a table of one when it comes to interpreting the standards applicable to the agency's determination of asylum eligibility.

## C.

The panel majority's rule also ignores the common sense reality that triers of fact may—and frequently do—decide factual issues against a party without affirmatively finding that party not credible.  Opposing parties who present conflicting factual accounts might both be credible even if only one party's version is true.[8]  And even if a witness's testimony is treated as "honest or 'credible,'" the "inability to provide important details and key dates" may render "the testimony unpersuasive in establishing a likelihood of torture."  *Doe*, 651 F.3d at 830.

Indeed, we regularly require that juries decide between competing versions of the "facts" and we do not suggest that one perspective can be discounted only if the witness is not believable (i.e., not credible).  The REAL ID Act recognizes this reality when it commands the trier of fact to "weigh the credible testimony along with other evidence of record." 8 U.S.C. § 1158(b)(1)(B)(ii).  A rule that bars an IJ from questioning the persuasiveness of a witness's testimony unless the witness is affirmatively found to be not credible ignores the realities of factfinding.

---

[8] As we stated in *Aden*, "[a]pparently honest people may not always be telling the truth, apparently dishonest people may be telling the absolute truth, and truthful people may be honestly mistaken or relying on unreliable evidence or inference themselves."  *Aden*, 589 F.3d at 1045.

The panel's holding here defies common sense for another reason. The evidence that the IJ and the BIA found to weigh against asylum eligibility was Dai's own testimony. As Judge Trott pointed out, the agency thus *credited* Dai's admissions that tended to undercut his claim. It makes no sense to say that the IJ is powerless to *credit* unfavorable testimony given by an applicant unless the IJ expressly finds the applicant *not* credible.

This case is an instance of our court "promulgat[ing] rules that tend to obscure [the proper] standard and to flummox immigration judges." *Jibril*, 423 F.3d at 1138. By essentially forcing IJs to make an express adverse credibility finding whenever they do not accept an applicant's proffered reasons as the whole truth, the panel's holding calls into question virtually every IJ decision denying a claim for asylum that lacks an explicit adverse credibility finding. *Cf. Morgan v. Holder*, 634 F.3d 53, 57 (1st Cir. 2011) (declining to require a "gratuitous credibility determination" when the IJ's decision was premised on the petitioner's "failure to carry his burden of proof"). With all of the cases we see that are adjudicated at the asylum eligibility stage, the impact of the panel's holding will be far-reaching.

### D.

The panel's revival of the "deemed true" rule effectively strips the agency of its factfinding role, allowing us to take that role for ourselves. Indeed, that is exactly what the panel did here. After "wip[ing] the record clean of everything identified by the IJ and the BIA as problematic," *see Dai*, 916 F.3d at 748 (Trott, J., dissenting), the majority stepped into the void created by its new rule and weighed for itself the persuasiveness of Dai's testimony. "[T]aking into account

the record as a whole," the majority concluded, "nothing undermines the persuasiveness of Dai's credible testimony." *Dai*, 884 F.3d at 871.[9]  That is not our role.

In addition to creating a rule that conflicts with the statute and precedent, the panel compounded its error by failing to remand to allow the agency the first shot at applying the majority's new rule against "smuggl[ing]" credibility concerns "into the persuasiveness inquiry," *see Dai*, 884 F3d. at 872.  The Supreme Court has summarily reversed us on multiple occasions for making this very error.  *See, e.g.*, *Thomas*, 547 U.S. at 187; *Ventura*, 537 U.S. at 18.

In *Ventura*, a panel of our court took it upon itself to consider (and reject) the government's factual argument that had been accepted by the IJ but not ruled on by the BIA. *Ventura*, 537 U.S. at 13–14.  The Supreme Court concluded that "well-established principles of administrative law" required a remand to the agency:

> Within broad limits the law entrusts the agency to make the basic asylum eligibility decision here in question.  In such circumstances a 'judicial judgment cannot be made to do service for an administrative judgment.'  Nor can an 'appellate court . . . intrude upon the domain which Congress has exclusively entrusted to an administrative agency.'"

---

[9] When the panel majority quoted the statute's requirement of persuasiveness, it left out the part that an asylum applicant must "satisf[y] the *trier of fact* that the applicant's testimony is . . . persuasive," 8 U.S.C. § 1158(b)(1)(B)(ii) (emphasis added).  *See Dai*, 884 F.3d at 867.

*Id.* at 16 (citations omitted) (quoting *Chenery Corp.*, 318 U.S. at 88).  In summarily reversing us, the Court stated that we "committed clear error," "seriously disregarded the agency's legally mandated role," and "created potentially far-reaching legal precedent . . . without giving the BIA the opportunity to address the matter in the first instance in light of its own expertise."  *Id.* at 17.

The clear, unanimous reversal in *Ventura* should have been enough, but, as Judge Trott put it, "old ways die hard." *Dai*, 916 F.3d at 737 (Trott, J., dissenting).  Just two years later, we repeated our error in *Thomas*, only this time we were sitting en banc when we adopted a new rule *and* applied it to the case without allowing the agency to consider the question.  *Thomas*, 547 U.S. at 184.  The Supreme Court agreed with the Solicitor General that not only was our failure to remand erroneous, our error was "obvious in light of *Ventura*."  *Id.* at 185.

Setting aside for the moment the problems with the majority's new rule, the panel should have remanded to allow the agency an opportunity to determine Dai's eligibility for asylum within the new constraints imposed by the panel's decision.

### III.

The panel's insistence that an IJ must accept an applicant's favorable testimony as the whole truth, unless the IJ makes an explicit adverse credibility finding, is contrary to our limited scope of review under the REAL ID Act, contrary to precedent (from both our court and other circuits), contrary to reality, and just plain wrong.  And in directing the agency to grant withholding of removal and treat Dai as eligible for

asylum, rather than allowing the agency to apply the panel's new rule, the panel disregarded the Supreme Court's repeated admonishment against our seizing the role statutorily given to the agency.

I respectfully dissent from the denial of rehearing en banc.

---

O'SCANNLAIN and TROTT, Senior Circuit Judges, respecting the denial of rehearing en banc:

We agree with the views expressed by Judge Callahan in her dissent from the denial of rehearing en banc.

---

COLLINS, Circuit Judge, with whom BYBEE, BEA, IKUTA, BENNETT, R. NELSON, and BADE, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I agree with Judge Callahan that the panel majority's opinion effectively revives, for a potentially wide swath of cases, this court's discredited prior rule that when an alien seeking asylum is either found or deemed to have testified credibly to certain facts, those facts will be conclusively deemed to be true. As Judge Callahan persuasively explains, the panel majority's effective revival of this previously disavowed "deemed-true" rule contravenes controlling statutory language, the precedent of this court, the decisions of other circuits, and common sense. I therefore join in full her dissent from the order denying rehearing en banc.

In my view, however, the problems with the panel majority's opinion run even deeper, thereby greatly augmenting the potential damage that may flow from its flawed decision.  Specifically, the panel majority commits a further serious legal error, and reinforces a circuit split, in holding that the REAL ID Act does not abrogate a second rule that we have applied in asylum cases—namely, the rule that unless the agency has made an *explicit* finding that the applicant's testimony is not credible, this court will conclusively presume that testimony to be credible.  As this case well illustrates, we have inflexibly applied this conclusive presumption as, in effect, a "Simon says" rule: even where (as here) the record overwhelmingly confirms that the agency actually *disbelieved* critical portions of the applicant's testimony, we will nonetheless conclusively treat that testimony as credible if the agency did not make an explicit adverse credibility determination.  The panel majority's reaffirmation of this unwarranted "deemed-credible" rule thus perpetuates a regime in which—unlike other circuits—this court misreads the evidentiary record in asylum cases through the truth-distorting lens of counterfactual conclusive presumptions.  In doing so, the panel majority defies Congress's elimination of the deemed-credible rule in the REAL ID Act, which expressly replaces that rule's conclusive presumption of credibility with (at most) a "*rebuttable* presumption of credibility."  8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added).  But the panel majority here slips the Act's bonds, and we have abetted that escape by failing to take this case en banc.  I respectfully dissent.

## I.

In reviewing whether substantial evidence supports the agency's factual findings in asylum cases, this court has long employed a variety of "rules that tend to obscure" what should be a clear and deferential standard of review. *Jibril v. Gonzales*, 423 F.3d 1129, 1138 (9th Cir. 2005). Among those rules are a pair of presumptions about how to read the record in asylum cases—namely, our deemed-credible rule and our deemed-true rule. Under our traditional deemed-credible rule, both this court and the Board of Immigration Appeals ("BIA") were required to apply a conclusive presumption that an applicant was credible unless the Immigration Judge ("IJ") made an explicit adverse credibility finding. *See, e.g.*, *Dai v. Sessions*, 884 F.3d 858, 868 (9th Cir. 2018) ("Prior to the REAL ID Act, we held that in the absence of an explicit adverse credibility finding by the IJ or the BIA we are required to treat the petitioner's testimony as credible."); *She v. Holder*, 629 F.3d 958, 964 (9th Cir. 2010) ("Absent an adverse credibility finding, the BIA is required to 'presume the petitioner's testimony to be credible.'"). Under our further deemed-true rule, the facts recited in testimony found to be credible—or presumed to be credible by virtue of our deemed-credible rule—would then in turn be taken as true. *See, e.g.*, *Kataria v. INS*, 232 F.3d 1107, 1114 (9th Cir. 2000) ("In the absence of an explicit adverse credibility finding, we must assume that Kataria's factual contentions are true."); *Yazitchian v. INS*, 207 F.3d 1164, 1168 (9th Cir. 2000) ("Because the immigration judge found the Yazitchians' testimony credible, and the BIA did not make a contrary finding, we must accept as undisputed the facts as petitioners testified to them.").

By requiring the application of potentially counterfactual conclusive presumptions, these rules create an obvious risk of seriously distorting appellate review of the factual record. Thus, under our deemed-credible rule, no matter how clear it might be from the overall record that the IJ in fact disbelieved portions of the petitioner's testimony, that obvious disbelief must be *ignored* if the IJ did not *explicitly* state that the IJ disbelieved that testimony. In turn, under our deemed-true rule, the facts recited in that now-deemed-credible testimony then have to be taken *as true*.

This case well illustrates the truth-distorting effect of applying these conclusive presumptions. As both the BIA and the IJ explained, Dai's claim that his wife's forced abortion in China caused him to have a well-founded fear of persecution (thereby rendering him eligible for asylum) was severely undercut by the fact that his wife and daughter had not stayed with him in the United States but had voluntarily returned to China—a critical fact that Dai had initially attempted to conceal. *Dai v. Barr*, 916 F.3d 731, 738–42, 746–47 (9th Cir. 2018) (Trott, J., dissenting) (reproducing relevant portions of the IJ's and BIA's decisions).[1] As Judge Trott's panel dissent explains in detail, the IJ made eight specific findings concerning Dai's statements about his wife's and daughter's voluntary return from the United States and about Dai's motivations for staying in this country, and those detailed findings are flatly incompatible with the view that the IJ credited all of Dai's statements. *Id.* at 732. Because the record amply confirms that the IJ obviously (even if not

---

[1] At the time Judge Trott filed his amended panel dissent, the case caption had changed to reflect the corresponding change in Attorney General since the earlier filing of the panel opinion. *See* Fed. R. App. P. 43(c)(2).

explicitly) disbelieved certain of Dai's statements about his family's return, the BIA properly construed the IJ's findings as establishing that Dai had "'*not be[en] truthful*'" about his "'family voluntarily returning.'" *Id*. at 747 (quoting BIA decision) (emphasis added by Judge Trott). Put another way, a review of the record confirms that any presumption that the IJ found Dai's core statements to be credible has been overwhelmingly rebutted. Nonetheless, because the IJ did not *explicitly* find Dai's testimony not to be credible, the panel majority invokes a counterfactual conclusive presumption of credibility—and in doing so, it "expunge[s] from the record the blatant flaws in Dai's performance involving demeanor, candor, and responsiveness" and "disregard[s] inaccuracies, inconsistencies, and implausibilities in his story, and his barefaced attempt to cover up the truth about his wife's and daughter's travels and situation." *Id*. Moreover, by holding that "[c]redibility concerns that do not justify an adverse credibility finding cannot be smuggled into the persuasiveness inquiry so as to undermine the finding of credibility" required by the deemed-credible rule, *see* 884 F.3d at 872, the panel majority effectively requires that this deemed-credible testimony must also be deemed true. *See* Judge Callahan's Dissent at 30.

The REAL ID Act sought to eliminate our use of such truth-distorting conclusive presumptions. Indeed, we have previously recognized that the REAL ID Act indisputably "swept away" our deemed-true rule, *Aden v. Holder*, 589 F.3d 1040, 1045 (9th Cir. 2009), and the panel majority's opinion does not expressly dispute that point. Instead, as Judge Callahan explains, the panel majority effectively revives the deemed-true rule, as a *practical* matter, by improperly "limit[ing] the evidence an IJ can consider" in determining whether an alien's credible testimony is sufficiently

*persuasive*, in light of the record as a whole, to carry the alien's burden of proof.  *See* Judge Callahan's Dissent at 28; *see also* 8 U.S.C. § 1158(b)(1)(B)(ii) (asylum applicant's testimony may be sufficient to carry burden of proof if it "is credible, *is persuasive*, and refers to specific facts sufficient to demonstrate that the applicant is a refugee") (emphasis added).

As to the deemed-credible rule, the panel majority itself acknowledges that the REAL ID Act frees *the BIA* from having to follow that rule's conclusive presumption, "so that the BIA [now] must only afford 'a *rebuttable* presumption of credibility' when the IJ does not make an adverse credibility finding." *Dai*, 884 F.3d at 868 n.8 (citation omitted); *see also* 8 U.S.C. § 1158(b)(1)(B)(iii) ("if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal"). Nonetheless, the panel majority insists that the REAL ID Act preserves the deemed-credible rule's conclusive presumption in *this court*.  884 F.3d at 868–69.  As a result, the panel majority reasoned that if the IJ does not make an explicit adverse credibility determination and the BIA does not explicitly determine that the resulting presumption of credibility on appeal has been rebutted, then this court must conclusively presume the petitioner's testimony to be credible.  *Id*. at 869–70.  Concluding that "neither the IJ nor the BIA made an adverse credibility determination in Dai's case," the panel majority held that the deemed-credible rule applies and that this court therefore "must treat his testimony as credible."  *Id*. at 870.

In my view, the panel majority's invocation of the deemed-credible rule rests on two critical legal errors, and we

should have taken this case en banc to correct and clarify the governing principles in this vital area of the law.

## II.

First, even if the panel majority were correct in concluding that "neither the IJ nor the BIA made an adverse credibility determination," *Dai*, 884 F.3d at 870; *but see infra* at 48–51, the REAL ID Act expressly prohibits this court from then applying a conclusive presumption of credibility. Instead, in reviewing the record, we would at most apply a *rebuttable* presumption of credibility—and here the facts found by the IJ overwhelmingly rebut any presumption that the IJ believed Dai's statements concerning his family's return to China. *See Dai*, 916 F.3d at 747 (Trott, J., dissenting) ("Simply because the IJ did not say 'I find Dai not credible' but opted instead to expose the glaring factual deficiencies in Dai's presentation and to explain in specific detail and at length why Dai had not persuasively carried his burden," the majority wrongly holds that "we must selectively embrace [his testimony] as persuasive….").

## A.

Section 208(b)(1)(B) of the Immigration and Nationality Act ("INA"), as added by section 101(a)(3) of the REAL ID Act of 2005, Pub. L. 109-13, Div. B, 119 Stat. 302, 303 (2005), *directly* addresses the questions of whether and when a presumption of credibility should be applied in reviewing an application for asylum. Specifically, subsection 208(b)(1)(B)(iii) provides, in relevant part, as follows:

> There is no presumption of credibility, however, if no adverse credibility

determination is explicitly made, the applicant
or witness shall have a rebuttable presumption
of credibility on appeal.

8 U.S.C. § 1158(b)(1)(B)(iii). There is an obvious scrivener's
error in this run-on sentence (the first comma should have
been a semi-colon), but the effect of its "however" clause is
nonetheless clear: it abrogates our deemed-credible rule's
*conclusive* presumption of credibility and replaces it with
only a "*rebuttable* presumption of credibility." *Id*. (emphasis
added). As noted earlier, *see supra* at 38, under our pre-
REAL ID Act case law, "in the absence of an explicit adverse
credibility finding" by the IJ, both the BIA and this court
were "required to treat the petitioner's testimony as credible."
*Dai*, 884 F.3d at 868. But after the REAL ID Act's
amendments, the IJ's failure to make an explicit adverse
credibility determination gives rise only to a *rebuttable*
presumption that the IJ found the applicant's testimony to be
credible. Thus, if a review of the record otherwise makes
clear that (despite the lack of an express credibility
determination) the IJ did *not* believe certain aspects of the
applicant's statements, the "presumption of credibility on
appeal" is rebutted, and the BIA and this court no longer need
to close their eyes to that fact and no longer need to pretend
that the IJ found the testimony credible.

The panel majority conceded that this statutory language
abrogates our deemed-credible rule and replaces it with a
"'rebuttable presumption of credibility on appeal,'" *Dai*,
884 F.3d at 868 (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)), but
the majority holds that this provision "applies only to appeals
*to the BIA*, not to petitions for review *in our court*," *id*.
(emphasis added); *see also id*. at 868 n.8. That is true, the
panel majority concludes, because the rebuttable presumption

applies by its terms only "on appeal," 8 U.S.C. § 1158(b)(1)(B)(iii), and (unlike the BIA we exercise review in immigration cases by way of a "petition for review" under section 242(a)(5) of the INA, 8 U.S.C. § 1252(a)(5), and not by way of an "appeal." 884 F.3d at 869 (noting the formal differences between a "petition for review" and an "appeal"). Because, according to the panel majority, *the BIA* here failed to invoke the REAL ID Act's rebuttable presumption to determine that any aspect of Dai's testimony was not credible, *but see infra* at 48–51, *this court* is required to adhere to our deemed-credible rule and to conclusively presume that Dai's testimony is credible.

This argument fails, because the panel majority's sharp distinction between a "petition for review" and an "appeal" is refuted by the very statutory provision on which the majority relies. Section 242 of the INA does in fact state that our review of removal orders is by means of a "petition for review," 8 U.S.C. § 1252(a)(5), but elsewhere in that very same section, the resulting proceeding in this court is expressly referred to as an "appeal." *See* 8 U.S.C. § 1252(b)(3)(C) (stating that, if the alien fails to file a brief in support of the "petition for judicial review," then "the court shall dismiss *the appeal*") (emphasis added). Given that the judicial-review provision on which the panel majority relies *itself* expressly refers to a "petition for review" as giving rise to an "appeal," there is no textual basis for the panel majority's conclusion that the reference to an "appeal" in section 208(b)(1)(B)(iii) excludes a "petition for review." *See Pereira v. Sessions*, 138 S. Ct. 2105, 2115 (2018) (reaffirming, and applying to the INA, the "'normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning'") (citation omitted). Moreover, applying section

208(b)(1)(B)(iii)'s "rebuttable presumption of credibility on appeal" to *both* the BIA and the courts of appeals is consistent with the ordinary meaning of the phrase "on appeal," which refers to the *process* of appellate review, without regard to whether such review is formally denominated as an "appeal." *See Dai*, 916 F.3d at 735 (Trott, J., dissenting) ("[T]he issue is one of *function*, not of form or labels."). Congress's explicit abrogation of the deemed-credible rule thus extends to this court.

Contrary to the panel majority's view, the abrogation of the deemed-credible rule in this court, and its replacement with a rebuttable presumption of credibility, would not intrude on the agency's factfinding role. *See Dai*, 884 F.3d at 874 & n.14. As applied on appeal, the REAL ID Act's rebuttable presumption provides a rule about *how to read the record of the IJ's factfinding*: if no express adverse credibility determination was made by the IJ, we should presume that the IJ found the applicant's statements credible *unless* (as here) the findings as a whole nonetheless confirm that certain statements were disbelieved by the IJ. The rebuttable presumption is thus not a license for the BIA or this court to engage in factfinding. *Cf.* 8 C.F.R. § 1003.1(d)(3)(iv) ("Except for taking administrative notice of commonly known facts such as current events or the contents of official documents, the Board will not engage in factfinding in the course of deciding appeals."). Instead, it is an instruction to stop reading IJ decisions through the distorted lens of our deemed-credible rule. In fact, it is the panel majority's adherence to the deemed-credible rule's *irrebuttable* presumption of credibility that usurps the agency's authority. As this case well illustrates, the effect of that rule is to require the Court *automatically* to accept as credible statements that

the IJ plainly disbelieved. *See* 916 F.3d at 747 (Trott, J., dissenting).

### B.

But even if the panel majority were correct that the REAL ID Act's "rebuttable presumption" of credibility does not apply to petitions for review in this court, that would *not* have the consequence of preserving the deemed-credible rule. On the contrary, it would have the opposite effect: it would mean that *no* presumption of credibility applies in this court.

The panel majority overlooks the full language of the last sentence of section 208(b)(1)(B)(iii), which (1) establishes a general rule that "[t]here is no presumption of credibility" at all, and (2) then carves out an exception under which a rebuttable presumption of credibility will apply "on appeal" if "no adverse credibility determination is explicitly made." 8 U.S.C. § 1158(b)(1)(B)(iii). Indeed, this sentence of the REAL ID Act previously contained *only* the initial language eliminating entirely any presumption of credibility, *see* 151 Cong. Rec. H536–37 (daily ed. Feb. 10, 2005) (reproducing text of H.R. 418, as considered by the House); the exception to that general rule was later added by a House-Senate conference committee before final passage, *see* H.R. Conf. Rep. No. 109-72, at 73–74 (2005); *see also id*. at 168, *reprinted in* 2005 U.S.C.C.A.N. 240, 293. Accordingly, if the panel majority is correct that the "rebuttable presumption" exception does not apply in this court, then the result would be that the default general rule applies instead—*i.e.*, that "[t]here is no presumption of credibility" in this court. That would abrogate the deemed-credible rule completely, and it would mean that this court would not use any presumption of credibility (rebuttable or irrebuttable) in conducting its

otherwise deferential review of the agency's decision. *See Huang v. Holder*, 744 F.3d 1149, 1153 (9th Cir. 2014).

Notably, such a reading of section 208(b)(1)(B)(iii) would bring our approach to review in line with that of the First Circuit, which has "rejected the proposition that aliens are entitled to a presumption of credibility on review in this court if there is no express credibility determination made by an IJ." *Kho v. Keisler*, 505 F.3d 50, 56 (1st Cir. 2007); *see also Zeru v. Gonzales*, 503 F.3d 59, 73 (1st Cir. 2007) ("There is no presumption that an alien seeking refugee status is credible. Nor is there an assumption that if the IJ has not made an express finding of non-credibility, the alien's testimony must be taken as credible."). Although *Kho* agrees with the panel majority's conclusion that the REAL ID Act's rebuttable presumption of credibility does not apply in the courts of appeals, *see* 505 F.3d at 56—a conclusion I think is wrong for the reasons stated above—the First Circuit reached that conclusion only in the course of rejecting the petitioner's contention that the REAL ID Act required the First Circuit to replace its rule of *no presumption* of credibility with a *rebuttable* presumption. *See id.* at 56–57. The resulting First Circuit position—that no presumption of credibility applies—conflicts with our continued adherence to the deemed-credible rule, thereby confirming a circuit split. Moreover, unlike our deemed-credible rule, the First Circuit's no-presumption rule is at least consistent with the default rule that would apply under the REAL ID Act *if* the First Circuit and the panel majority were correct in holding that the rebuttable-presumption exception does not apply in the courts of appeals. *See* 8 U.S.C. § 1158(b)(1)(B)(iii) ("There is no presumption of credibility….").

III.

Second, the panel majority committed a wholly separate legal error in declining to give effect to *the BIA's* express conclusion that, given the IJ's detailed findings, Dai had not been truthful concerning his family's return to China.

While agreeing that *the IJ* had not made an "explicit adverse credibility finding," the BIA here went on to note that the IJ's detailed findings established that Dai had *not* been "truthful" about his "family voluntarily returning" to China. *Dai*, 916 F.3d at 747 (Trott, J., dissenting) (reproducing BIA decision). In thus correctly recognizing that the IJ's findings precluded any suggestion that the IJ found these aspects of Dai's statements credible, the BIA did not engage in its own factfinding, but instead properly read *the record of the IJ's findings* in accord with the applicable rebuttable presumption of credibility. 8 U.S.C. § 1158(b)(1)(B)(iii); *cf.* 8 C.F.R. § 1003.1(d)(3)(iv) (BIA does not engage in independent factfinding).[2] Although the BIA did not expressly invoke that

---

[2] Throughout its opinion, the panel majority uses imprecise language that could be misread to suggest that, under the REAL ID Act, the BIA has independent authority to make an adverse "finding" of credibility that the IJ did not make. *See, e.g.*, *Dai*, 884 F.3d at 863 ("We think it not too much to ask of IJs and the BIA that they make an explicit adverse credibility *finding*") (emphasis added); *id*. at 865 ("The BIA acknowledged that the IJ did not make an adverse credibility finding *and also did not make one itself*.") (emphasis added); *id*. at 867 (noting that the BIA "also made no adverse credibility *finding*") (emphasis added); *id*. at 869 (deemed-credible rule applies "when the BIA has on appeal neither affirmed an adverse credibility finding made by the IJ *nor made its own finding after deeming the presumption of credibility rebutted*") (emphasis added). Given that only the IJ engages in factual finding, and not the BIA, *see* 8 C.F.R. § 1003.1(d)(3)(iv), I construe these comments by the panel majority to instead be referring only to the BIA's explicit authority under

rebuttable presumption, its *analysis* in construing the IJ's findings reflects precisely what the REAL ID Act authorizes the BIA to do. In turn, the resulting *express* adverse credibility determination that is properly recited in the BIA's decision should have precluded the panel majority from invoking the deemed-credible rule even on that rule's own terms. *Cf. Tijani v. Holder*, 628 F.3d 1071, 1080 (9th Cir. 2010) (so long as the finding is "explicit," an "adverse credibility finding does not require the recitation of a particular formula").

The panel majority nonetheless refused to give effect to the BIA's explicit determination that the record established that Dai had not been truthful, and it therefore proceeded to apply the deemed-credible rule. The panel majority gave several reasons for doing so, but all of them are flawed.

First, the panel majority wrongly dismissed the BIA's determination as the "'sort of passing statement [that] does *not* constitute an adverse credibility finding.'" *Dai*, 884 F.3d at 867 (quoting *Kaur v. Holder*, 561 F.3d 957, 962–63 (9th Cir. 2009)) (emphasis added). As Judge Trott's dissent makes clear, the BIA's express adverse credibility determination on this point was not a "passing" one—it related directly to the central issue of why Dai sought to remain in the United States, and it refuted his claim that he had a well-founded fear of persecution if he returned to China. *See Dai*, 916 F.3d at 747–48 (Trott, J., dissenting).

_____

the REAL ID Act to determine that the record rebuts the presumption that *the IJ* found the applicant credible. To avoid any suggestion that the BIA is itself engaging in independent factfinding, I will refer in this dissent to the BIA's "determination" concerning what the IJ's findings show about the applicant's credibility.

For the same reasons, the panel majority is equally wrong in its assertion that Dai's untruthfulness related only to a "tangential point." *Dai*, 884 F.3d at 873.

The panel majority's citation of *Kaur* only highlights its error on this score. In *Kaur*, we held that the BIA erred when it invoked the IJ's vague and passing comment that "there are certain instances where this court does not find the Applicants' testimony to be credible" in order to *overturn* the IJ's explicit "affirmative credibility finding" as to *one* of the two Applicants—*i.e.*, Kaur. 561 F.3d at 962–63; *see also id*. at 962 (noting that the IJ had found that Kaur was "a convincing witness" with a "credible demeanor" and whose "testimony was detailed, consistent and plausible"). As we explained, the IJ's "passing" and "selected reference" was "not even specific to Kaur" and could not properly be read to "undermine or detract" from the specific and detailed "positive credibility finding" as to Kaur. *Id*. at 963; *see also id*. ("From this truncated reference, one would be hard pressed to identify any basis for finding a lack of credibility as the IJ identified none."). Here, in sharp contrast to *Kaur*, (1) the BIA did not overturn an express finding of credibility by the IJ; and (2) the BIA made a specific determination that the IJ's findings established that Dai was not credible as to a *particular* point.

Second, the panel majority alternatively stated that the BIA's determination that Dai had "lied about one particular fact" could be disregarded because it did not amount to a "*general* adverse credibility finding." *Dai*, 884 F.3d at 867 (emphasis added). That is plainly incorrect, and the implications of such a rule would be quite troubling. The normal rule in any adjudication is that a trier of fact may believe or disbelieve a witness's testimony in whole or in

part, *see*, *e.g.*, *Li v. Holder*, 738 F.3d 1160, 1163 (9th Cir. 2013), and there is no basis for adopting, in the immigration context, the distinctive (and illogical) rule that credibility must be determined on a "general" basis. *Cf. Toufighi v. Mukasey*, 538 F.3d 988, 994–95 (9th Cir. 2008) (although, as the applicant noted, "the IJ found him generally credible," this court concluded "that the IJ did make an express adverse credibility determination" as to the specific issue of his "claim that he converted to Christianity"). In support of its position, the panel majority pointed to authority holding that a vague and tentative statement "'that a petitioner is "not *entirely* credible" is not enough' to constitute an adverse credibility finding," *Dai*, 884 F.3d at 867 (quoting *Aguilera-Cota v. INS*, 914 F.2d 1375, 1383 (9th Cir. 1990)) (emphasis added), but here the BIA's adverse credibility determination was explicit, direct, and specific. Accordingly, nothing in *Aguilera-Cota* supports the panel majority's novel suggestion that a *partial* finding of untruthfulness is inadequate, and that only a "*general* adverse credibility finding" will do. (And if *Aguilera-Cota* had adopted that view, then we should overrule that case en banc as well.)

Moreover, by failing to give effect to the BIA's explicit determination that the record revealed Dai's partial lack of truthfulness, the panel majority effectively created yet another flawed "Simon says" rule, in addition to our deemed-credible rule. Under the panel majority's decision, the BIA's failure to *expressly* state that it was invoking the REAL ID Act's rebuttable presumption in this case means that this court should act as if the BIA had not done so. The panel majority erred by yet again devising counterfactual presumptions that distort our reading of the administrative record on appeal.

\*     \*     \*

Given that we have eschewed a magic-words approach to explicit credibility determinations, the BIA's express statement that Dai was not "truthful" was a permissible application of the REAL ID Act's rebuttable presumption of credibility, and that statement is sufficiently explicit to preclude application of the deemed-credible rule on its own terms. But more importantly, the REAL ID Act expressly abrogates the deemed-credible rule entirely and replaces it with, at most, a rebuttable presumption of credibility. And here, any presumption that the IJ actually believed Dai's statements about his family's voluntary return has been amply rebutted. Our persistence in applying an irrebuttable presumption that is at odds with the statute and at odds with a common-sense reading of this record is deeply troubling and warrants en banc review.

I respectfully dissent from the denial of rehearing en banc.